### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **CAM YUEN et al.,** *on behalf of themselves and all others similarly situated,* | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| v. | ) ) | **2:22-cv-00392-JDL** |
| **IDEXX LABORATORIES, INC., et al.,** | ) ) ) | |
| **Defendants.** | ) ) ) | |

### ORDER ON DEFENDANTS' RENEWED MOTION TO DISMISS

The Plaintiffs in this putative class action allege that Defendants IDEXX Laboratories, Inc., and IDEXX Distribution, Inc., (collectively, "IDEXX") have engaged in anti-competitive behavior that has caused the Plaintiffs to pay artificially inflated prices for veterinary diagnostic products. IDEXX is a provider of veterinary diagnostic products, including analyzers, consumable reagents, and single-use rapid test kits. The Class Action Complaint ("Complaint"), dated July 25, 2022 (ECF No. 1), alleges violations of Sections 1 and 2 of the Sherman Antitrust Act (the "Sherman Act"), 15 U.S.C.A. §§ 1-2 (West 2023), and a variety of state antitrust and consumer protection statutes. IDEXX moves to dismiss all federal and state claims (ECF No. 86). Because I conclude that the Plaintiffs lack antitrust standing regarding the federal antitrust claims, I grant the motion in part and, for reasons I will explain, deny the motion in part with respect to the state law antitrust and consumer protection claims.

# I.  BACKGROUND

The following facts are derived from the Complaint.  I treat the non-conclusory factual allegations in the Complaint as true for the purpose of analyzing the motion to dismiss.  *See Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011).

The twenty-two named Plaintiffs are pet owners from a variety of states who assert that they have borne the costs of IDEXX's supra-competitive prices, which were passed on to them by their veterinarians.  Plaintiffs bring the Complaint on their own behalf and on behalf of all similarly situated plaintiffs in thirty-one jurisdictions.[1]  IDEXX sells its diagnostic test equipment by forgoing a middleman and distributors and selling directly to veterinary practices.  To accomplish this sales model, IDEXX enters into contracts with veterinary practices that have minimum purchasing quotas and require exclusivity with IDEXX.  The Complaint asserts that this model has enabled IDEXX to shut out competition and impose above-market prices for its diagnostic test equipment—costs that are ultimately passed on to the pet owners.

IDEXX's contracts run for six years and contain "steep 'disloyalty' penalty provisions" that are "scaled to the practice's individual purchase history" to "lock-in" the veterinary practice.  ECF No. 1 at 4, ¶ 7.  Veterinary practices face what the Complaint describes as devastating and unsustainable penalties if they try to extricate themselves from IDEXX's contracts.  Furthermore, the Plaintiffs allege that

---

[1]  Specifically, the Plaintiffs bring the Complaint on behalf of plaintiffs in "repealer jurisdictions"— jurisdictions that have repealed the *Illinois Brick* bar on indirect purchaser plaintiff recovery described below.  *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  The Plaintiffs identify thirty-one U.S. jurisdictions, including Maine, as "repealer jurisdictions."

IDEXX strictly enforces its contracts through aggressive collection actions and designs its products to ensure that veterinary practices will not use more than one brand of analyzer or consumable at a time.

The Complaint asserts that, through these practices, IDEXX has foreclosed competition and wields monopoly power because the cost for a veterinary practice to switch to a competitor supplier is prohibitively high.  Each of IDEXX's two main competitors, Heska Corporation and Zoetis, Inc., is alleged to have a lower market share than IDEXX.  The Plaintiffs assert that IDEXX's outsized market share allows it to continually raise its prices with minimal loss of customers.  The Complaint also asserts that "IDEXX's anticompetitive behavior has caused pet owners like Plaintiffs and other similarly situated indirect purchasers to pay artificially inflated prices for in-house point-of-care ("POC") analyzers, consumables, and single-use rapid test kits, which are components of in-house POC diagnostic tests that veterinary practices use to treat family pets and other companion animal patients."  As context for their claims, the Plaintiffs argue that the antitrust market relevant to this action is the sale of in-clinic diagnostic products, which is composed of two submarkets: the sale of analyzers and consumables[2] and the sale of single-use rapid test kits.  According to the Plaintiffs, IDEXX has a monopoly in both the relevant antitrust market and the two submarkets, and there are high barriers to entry for potential competitors.

---

[2]  According to the Complaint, "analyzers" are devices, instruments, or machines that are used to perform diagnostic testing at veterinary clinics, and "consumables" are single-use items such as slides and reagents that are loaded into analyzers for testing.

In terms of federal claims, the Plaintiffs allege in Counts 1 and 2 that, by entering into anticompetitive agreements with veterinary practices, IDEXX has injured Plaintiffs in violation of Sections 1 and 2 of the Sherman Act, which proscribe unreasonable restraints of trade and monopolizing trade, respectively. *See* 15 U.S.C.A. §§ 1, 2. The Plaintiffs seek injunctive and declaratory relief to prevent further violations, but they do not seek any damages under federal antitrust law.

With respect to state law claims, the Plaintiffs allege in Counts 3 through 28 that IDEXX's conduct violates the antitrust laws of several states[3] and the District of Columbia. According to the Plaintiffs, "[a]lthough each individual count relies upon state law, the essential elements of each state antitrust claim are the same," so showing that IDEXX's conduct violated the "federal Sherman Antitrust Act, will, if proven, establish a claim under each of the state laws [pleaded]." ECF No. 1 at 46, ¶ 196. The Plaintiffs contend that they are entitled to various forms of relief available under the state laws, including damages. Finally, the Plaintiffs assert in Counts 29 through 43 that IDEXX's conduct violates the consumer protection laws of several states[4] and the District of Columbia. Again, the Plaintiffs seek various forms of relief available under the state laws, including damages.

The Plaintiffs filed their Complaint in the U.S. District Court for the Northern District of California. IDEXX moved to transfer venue to the District of Maine asserting that, among other things, many relevant witnesses are in Maine where

---

[3] Arizona, California, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin.

[4] California, Florida, Massachusetts, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Rhode Island, South Carolina, Utah (two different statutes), and Vermont.

IDEXX is headquartered (ECF No. 53).   Concurrently, IDEXX filed a Motion to Dismiss similar to the motion currently under advisement (ECF No. 54).   The Plaintiffs opposed the transfer of venue (ECF No. 55), but the Northern California District Court granted IDEXX's Motion to Transfer Venue (ECF No. 58).   After the case was transferred to the District of Maine, IDEXX filed its Renewed Motion to Dismiss (ECF No. 86), asserting that (1) the pet owners are disfavored plaintiffs who lack antitrust standing under the Sherman Act; (2) the Plaintiffs likewise lack standing to bring state law antitrust claims; and (3) the Plaintiffs' state law consumer protection claims also fail for lack of standing and other reasons.

## II.  DISCUSSION

### A.    Motion to Dismiss: Legal Standard

"There is no special pleading requirement for motions to dismiss in the context of an antitrust action." *Breiding v. Eversource Energy*, 344 F. Supp. 3d 433, 438 (D. Mass. 2018).   Instead, the regular Rule 12(b)(6) standard applies.   "To avoid dismissal, a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *García-Catalán v. United States*, 734 F.3d 100, 102 (1st Cir. 2013) (quoting Fed. R. Civ. P. 8(a)(2)).   "At the pleading stage, the plaintiff need not demonstrate that she is likely to prevail, but her claim must suggest 'more than a sheer possibility that a defendant has acted unlawfully.'" *Id.* at 102-03 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).   The Court "accept[s] as true all well-pleaded facts set forth in the complaint and draw[s] all reasonable inferences therefrom in the pleader's favor." *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (quoting *Artuso v. Vertex Pharm., Inc.*, 637 F.3d 1, 5 (1st Cir. 2011)).   But "[i]f

the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *Id.* (quoting *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc)).

## B.   Federal Antitrust Standing

IDEXX's overarching argument for dismissing the federal antitrust claims is that the Plaintiffs are consumers of veterinary services, not of IDEXX's veterinary products, and therefore lack antitrust standing to challenge the prices charged for those products.   The Clayton Act creates private causes of action for violations of federal antitrust law, *see* 15 U.S.C.A. §§ 15, 26 (West 2023), but plaintiffs must satisfy the threshold requirements of the "'antitrust standing' doctrine" to bring such a claim. *Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 293 (1st Cir. 2022).

The purpose of antitrust standing is "'to avoid overdeterrence' and to 'ensure that suits inapposite to the goals of the antitrust laws are not litigated and that persons operating in the market do not restrict procompetitive behavior because of a fear of antitrust liability.'" *Id.* (quoting *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999)).   Antitrust standing is distinct from Article III standing in that the former is a prudential requirement[5] whereas the latter is a constitutional

---

[5] In *Serpa Corp.*, the First Circuit explained:

> Standing is restricted in antitrust cases to avoid overdeterrence.   By limiting the availability of private antitrust actions to certain parties, federal courts "ensure that suits inapposite to the goals of the antitrust laws are not litigated and that persons operating in the market do not restrict procompetitive behavior because of a fear of antitrust liability." . . . The result is that standing in an antitrust case is "not simply a search for an injury in fact; it involves an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws."

199 F.3d at 10 (citation omitted) (quoting *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448-49 (11th Cir. 1991)).

requirement.  *See id.* at 292-93 (distinguishing between antitrust and Article III standing); *RSA Media, Inc. v. AK Media Grp., Inc.*, 260 F.3d 10, 13 (1st Cir. 2001) (quoting *Serpa Corp.*, 199 F.3d at 10).  The doctrine "seek[s] to ensure that the prospective antitrust plaintiff has suffered an injury of the kind antitrust laws were intended to prevent, such that the plaintiff is a proper party to bring a federal antitrust suit." *Vázquez-Ramos*, 55 F.4th at 293.

The requirements for federal antitrust standing are somewhat "less stringent" where a plaintiff seeks only equitable relief, *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 13 (1st Cir. 2008), and the antitrust standing analysis may involve different considerations where a plaintiff seeks an injunction rather than damages, *see Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111 n.6 (1986) (observing that standing determinations under Sections 4 and 16 of the Clayton Act will "not always be identical" because of the distinct remedies available under each section).  However, plaintiffs seeking injunctive relief must still satisfy the federal antitrust standing doctrine.  *See Vázquez-Ramos*, 55 F.4th at 293 & n.3 (citing Sections 4 and 16 of the Clayton Act as creating private causes of action for violations of federal antitrust law and noting that plaintiffs proceeding under either must satisfy the requirements of both Article III and antitrust standing.).

The Supreme Court has established a six-factor test for antitrust standing that courts must consider:

> (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury"); (4) the directness with which the alleged market restraint caused the

asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages.

*Serpa Corp.*, 199 F.3d at 10.  These are often referred to as the *Associated General* factors, or *AGC* factors, in recognition of the Supreme Court decision that announced them: *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983).  Although courts "technically balance" the *AGC* factors to determine if there is standing, the First Circuit has "emphasized the causation requirements" embodied in the first, third, and fourth factors.  *RSA Media, Inc.*, 260 F.3d at 14.  As explained in *RSA Media, Inc.*:

> Both the first and fourth factors expressly require causation between the alleged violation and the alleged harm.  And although the third factor does not explicitly raise the issue of causation, the Court has defined "antitrust injury" as injury of the type the antitrust laws were intended to prevent and that *flows from that which makes the defendants' acts unlawful*.  In other words, the third factor of the standing test requires a proper plaintiff to prove more than injury causally linked to an illegal presence in the market.  The plaintiff must prove that the injury is the type of loss that the claimed violations . . . would be likely to cause.  Even when a causal link has been established between the alleged violation and the injury, the absence of "antitrust injury" will generally defeat standing.

260 F.3d at 14 (emphasis in original) (internal quotation marks and citations omitted).

### 1. Applying the *Associated General* Test

#### a. The First, Third, and Fourth *Associated General* Factors: Antitrust Injury and Causation Requirements

IDEXX's arguments that the Plaintiffs lack antitrust standing focus primarily on whether the Plaintiffs are proper parties to bring this antitrust case and whether the allegations in the Complaint satisfy the collective causation requirements of the first, third, and fourth *Associated General* factors.

In considering the parties' contentions, I take the well-pleaded factual allegations in the Complaint as true, draw all reasonable inferences in the Plaintiffs' favor, and then determine if the Plaintiffs have plausibly narrated a claim for relief. *Zenon v. Guzman*, 924 F.3d 611, 615-16 (1st Cir. 2019). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels [the Court] 'to draw on' [its] 'judicial experience and common sense.'" *Id.* at 616 (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012)).

i. **Whether the Plaintiff Pet Owners Have Plausibly Alleged That They Are Consumers in the Market for Analyzers, Consumables, and Single-Use Rapid Tests**

IDEXX contends that the Plaintiff pet owners do not participate in the "market where trade is allegedly restrained"—the market for POC diagnostic products—but instead participate in the market for veterinary healthcare services that IDEXX's direct customers provide. *Serpa Corp.*, 199 F.3d at 10. Plaintiffs acknowledge that they are "indirect purchasers,"[6] ECF No. 87 at 22, in the market for POC diagnostic products but argue that they have standing because they pay the veterinarians not for their services but for the diagnostic products themselves.

---

[6] The fact that the Plaintiffs do not purchase items directly from IDEXX is not dispositive. To be sure, the rule in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), prevents indirect purchasers from suing an alleged antitrust violator for damages under federal antitrust law. However, that bar does not apply in actions involving declaratory and injunctive relief—only in damages cases. *See Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 n.1 (2019) ("*Illinois Brick* held that the direct-purchaser requirement applies to claims for damages. . . . [and] did not address injunctive relief . . . ."); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 n.24 (4th Cir. 2002) ("*Illinois Brick*'s indirect purchaser rule, when applicable, bars only compensatory damages relief and does not apply to injunctive relief."); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 346d (LEXIS 2023) ("*Illinois Brick* has not therefore barred an indirect purchaser's suit for an injunction.").

Some parts of the Complaint allege that the Plaintiffs actually purchase POC diagnostic products from veterinarians.  The Complaint alleges generally that each named Plaintiff "has purchased IDEXX POC Diagnostic Products, including analyzers, consumables, and single-use rapid test kits, from veterinary practices." ECF No. 1 at 9, ¶¶ 24-45.  It also asserts that, "[d]uring the Class Period . . . , veterinary practices . . . sold POC Diagnostic Products to Class members in the same form in which they purchased them from IDEXX, meaning IDEXX POC Diagnostic Products followed a traceable physical chain from Defendants to Plaintiffs and Class members, and the overcharges on them can be traced from Defendants to Plaintiffs and Class members."  ECF No. 1 at 39, ¶ 148.

However, the Plaintiffs do not allege specific facts supporting their assertion that they "purchase" POC diagnostic products.  Additional allegations in the Complaint make such an assertion seem implausible: most notably, the Complaint alleges that analyzers are in-office instruments that cost between $12,000 and $30,000, and that veterinary practices purchase them up-front as part of six-year contracts with IDEXX.  Nowhere in the 552 numbered paragraphs of the Complaint do the Plaintiffs affirmatively identify a situation where one or more of the Plaintiffs were charged and paid for—in whole or in part—a $12,000 to $30,000 IDEXX analyzer, a consumable, or a single-use rapid test kit.[7]

To meet the test of plausibility, the Complaint must contain facts suggesting that it is more than merely possible that one or more Plaintiffs purchased an IDEXX

---

[7]  Similarly, Plaintiffs' response to the Motion to Dismiss (ECF No. 87) does not refer to a single instance in which a Plaintiff purchased and was charged by a veterinarian for an IDEXX analyzer, consumable, or single-use rapid test kit.

analyzer, consumable, or single-use rapid test kit from a veterinarian.  The Plaintiffs' failure to plead any facts making that direct assertion or supporting a reasonable inference of the same suggests instead that such a transaction never occurred and that the Plaintiffs were either direct or indirect "purchasers" of analyzers, consumables, and single-use rapid test kits only in the sense that they purchased professional services from veterinarians who used those products.  Applying "judicial experience and common sense," *Zenon*, 924 F.3d at 616, and viewing the alleged facts in the light most favorable to the Plaintiffs, the Complaint does not plausibly allege facts showing that the Plaintiffs are purchasers in the allegedly threatened market that is the subject of their Complaint.

The First Circuit cases that the Plaintiffs cite do not support a different result. Plaintiffs contend that it is presumed in the First Circuit that "consumers, like Plaintiffs, have antitrust standing when they pay overcharges."  ECF No. 87 at 21. In support of this proposition, the Plaintiffs cite *SAS of Puerto Rico, Inc. v. Puerto Rico Telephone Co.*, 48 F.3d 39, 45 (1st Cir. 1995); *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999); and *Arroyo-Melecio v. Puerto Rican American Insurance Co.*, 398 F.3d 56, 72-73 (1st Cir. 2005).  I address each of these three decisions in turn.

In *SAS of Puerto Rico*, the First Circuit noted that presumptively "proper" plaintiffs in antitrust suits are customers or potential competitors in the allegedly threatened market.  48 F.3d at 44.  The court determined that the plaintiff there, a supplier of pay phones, was not actually a participant in either of the two markets allegedly dominated by the defendant: the provision of pay phone *service* in Puerto Rico and the provision of long-distance *service* from such pay phones.  *Id*.  The First

Circuit concluded that the supplier was not an appropriate antitrust plaintiff and affirmed the district court's dismissal of the case. *Id.* at 45-46.

The presumption favoring antitrust standing for competitors and consumers was also recognized in *Serpa Corp.*: "Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." 199 F.3d at 10. The plaintiff there, a distributor of plumbing supplies, brought an antitrust suit when it lost its position as the exclusive sales representative for the defendant, a manufacturer of plumbing supplies. 199 F.3d at 9-10. The court concluded that the plaintiff had not shown antitrust injury, reasoning that the distributor was not a presumptively favored plaintiff, like a competitor or customer, and that its injuries did not arise from the defendant's allegedly anticompetitive conduct. *Id.* at 12.

Finally, in *Arroyo-Melecio*, plaintiff car owners asserted antitrust claims against automobile insurance companies and an agency from whom they purchased insurance. 398 F.3d at 63. The plaintiffs were inarguably purchasers in the market that they alleged the defendants had unlawfully restrained: the car insurance market. The First Circuit held that, as consumers, the *Arroyo-Melecio* plaintiffs were "presumptively favored as appropriate plaintiffs to assert antitrust injury," *id.* at 72, and, on that basis, reversed the trial court's dismissal of their federal antitrust claims, *id.* at 74.

The three decisions—*SAS of Puerto Rico*, *Serpa Corp.*, and *Arroyo-Melecio*—do not support a finding of antitrust standing in this instance. Here, the Complaint does not plausibly allege that the Plaintiffs are consumers of POC diagnostic products in

a manner comparable to the *Arroyo-Melecio* plaintiffs who purchased automobile insurance. Like the plaintiffs in *SAS of Puerto Rico* and *Serpa Corp.*, the Plaintiffs here have allegedly experienced financial injury, but they are neither consumers or competitors in the allegedly restrained market who are presumptively favored plaintiffs for purposes of antitrust standing.

The Plaintiffs also cite *In re Automotive Parts Antitrust Litigation*, 50 F. Supp. 3d 869 (E.D. Mich. 2014), to support their argument. In that case, a class of automobile dealers and end-payor plaintiffs brought a lawsuit against suppliers of occupant safety restraint systems in automobiles "for engaging in a massive conspiracy to unlawfully fix and artificially raise . . . prices." *Id.* at 878. The plaintiffs in that case alleged that the markets for cars and for occupant safety restraint systems are "inextricably linked and intertwined." *Id.* at 887. The court found that the plaintiffs had standing under the *Associated General* factors, reasoning in part that "[t]he precise amount of the overcharge impacting the prices of new motor vehicles containing [occupant safety restraint systems] can be measured and quantified" and, therefore, "there is a reasonable inference . . . that Defendants' anticompetitive conduct harmed businesses and impacted the prices that consumers paid for new vehicles." *Id.*

The First Circuit Court of Appeals has not adopted the view, reflected in *In re Automotive Parts Antitrust Litigation*, that plaintiffs need not be market participants to have antitrust standing if their injuries occurred in a market that is "inextricably intertwined" with the market in which the claimed antitrust violation is alleged to have occurred. In *SAS of Puerto Rico*, the First Circuit expressed doubt that the

phrase "inextricably intertwined"—which the Supreme Court employed in *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484 (1982)—"was ever intended as a legal test of standing." 48 F.3d at 46. The First Circuit explained:

> Quite apart from difficulties in application, such a test would certainly be very hard to square with the longstanding limitations on claims by stockholders, employees and even indirect purchasers. Nothing in *McCready* suggests that it intended to overrule those limitations even though it would be very easy to describe such injuries as inextricably intertwined in the ordinary suggestive sense of the phrase.

*Id.* In *Serpa Corp.*, the First Circuit again rejected the "inextricably intertwined" language from *McCready* as establishing a standard for antitrust standing, explaining "that such an approach would needlessly expand the limits of antitrust standing currently in place in this Circuit."[8] 199 F.3d at 13. Thus, *McCready*'s "inextricably intertwined" language does not support antitrust standing for the Plaintiffs in the present case.

---

[8] In declining to apply the "inextricably intertwined" standard in *Serpa Corp.*, the First Circuit stated:

> Serpa urges the Court to apply the "inextricably intertwined" language of *McCready* to this case. We decline. First, this Court has already stated that "[i]t is doubtful that this language—if taken as a physical image—was ever intended as a legal test of standing." *SAS*, 48 F.3d at 46. Second, while standing in *McCready* was conferred to a plaintiff who was only derivatively injured, the plaintiff was a consumer in the market directly affected by the antitrust violation. Accordingly, subsequent Supreme Court jurisprudence has interpreted the *McCready* language as a legal conclusion; i.e., applying the "inextricably intertwined" standard to consumers and competitors. Moreover, even if we thought "inextricably intertwined" was a proper test for standing, the facts do not support its application in this case. Specifically, Serpa's marginal pricing discretion belies plaintiff's assertion that defendants necessarily had to terminate Serpa to eliminate competition in the New England plumbing supply market. Therefore, under the circumstances of this case, we decline to interpret *McCready* broadly, believing that such an approach would needlessly expand the limits of antitrust standing currently in place in this Circuit.

199 F.3d at 13 (internal citations omitted).

> **ii.    Whether the Plaintiff Pet Owners May Proceed as Derivatively Injured Antitrust Plaintiffs**

IDEXX argues further that, as indirect purchasers, Plaintiffs are disfavored antitrust plaintiffs who must show "good cause" to establish antitrust standing.  ECF No. 86 at 16-17 (quoting *SAS of Puerto Rico*, 48 F.3d at 45).  IDEXX contends that "good cause" is only shown if there is no other party more directly affected by the challenged conduct with the incentive and ability to bring the challenge.  IDEXX argues that good cause is not shown by the Complaint's allegations regarding the terms of its contracts with veterinary practices.

Plaintiffs argue that "IDEXX has robbed [veterinarians] of any practical ability" to bring suit, ECF No. 87 at 10, by imposing contractual terms that "adopt a loser-pays scheme, which undoes the legislative policy of allowing antitrust plaintiffs to recover attorney's fees if they prevail without owing them if they lose," ECF No. 87 at 13.  In support, the Plaintiffs contend that the contracts' terms "prevent veterinarians from recovering treble damages or trying their cases to a jury."  ECF No. 87 at 13.  Further, the Plaintiffs assert that "the contracts also require veterinarians to bring any lawsuit only on an individual basis, and not to seek to have it heard as a class action, a representative action, a collective action, a private attorney-general action, or in any proceeding that joins, consolidates, or combines legal proceedings."  ECF No. 87 at 13.

In some circumstances, a disfavored plaintiff may be found to have antitrust standing if good cause is shown—particularly if there is no "first best" plaintiff that has an incentive or ability to sue.  *Serpa Corp.*, 199 F.3d at 12; *SAS of Puerto Rico*, 48 F.3d at 45.  In *Serpa Corp.*, the First Circuit found that there was no good cause

to extend antitrust standing to a distributor plaintiff because, contrary to the plaintiff's contention, it was not the only viable plaintiff—both the defendant manufacturer's competitors and consumers had the incentive and ability to assert antitrust claims.  199 F.3d at 12-13.  And in *SAS of Puerto Rico*, the First Circuit concluded that there was no good cause to confer antitrust standing on the plaintiff, a supplier, because "those threatened by the [alleged] market injury . . . include various potential plaintiffs . . . who should have ample incentive and ability to challenge violations."  48 F.3d at 45.  Thus, the plaintiff had not shown good cause as a "second-best plaintiff" to assert antitrust standing.  48 F.3d at 45.

Applying the preceding principles here, I first consider the clause in IDEXX's contracts with veterinarians that bars class action lawsuits and, by extension, other forms of representative, collective, private attorney-general, and similar proceedings cited by Plaintiffs.  The Supreme Court has explained in connection with class action waivers:

> The antitrust laws do not evince an intention to preclude a waiver of class-action procedure.  The Sherman and Clayton Acts make no mention of class actions.  In fact, they were enacted decades before the advent of Federal Rule of Civil Procedure 23, which was designed to allow an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.

*Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013) (internal quotation marks and citations omitted).  In *Italian Colors*, the Supreme Court upheld the enforcement of a contract's individual arbitration requirement, stating that the parties had "agreed to arbitrate pursuant to that usual rule, and it would be remarkable for a court to erase that expectation."  *Id.* (quotation marks omitted); *see also In re Am. Express Anti-Steering Rules Antitrust Litig.*, 433 F. Supp. 3d 395, 407

(E.D.N.Y. 2020), *aff'd*, 19 F.4th 127 (2d Cir. 2021).  The reasoning employed in *Italian Colors* suggests that the class action clause here does not deprive contracting veterinarians of the ability to enforce federal antitrust laws.  Plaintiffs have not cited to any authority to the contrary.

The Plaintiffs also fail to cite to any case authority in connection with the alleged additional barriers to suit contained in IDEXX's contracts—including the "loser-pays" requirement with respect to attorney's fees, and the restrictions on treble damages and jury trials.  These impediments, whether considered individually or collectively, do not demonstrate that the veterinarians who contract with IDEXX lack the "incentive or ability to sue" as first-best plaintiffs.  *SAS of Puerto Rico*, 48 F.3d at 45.  Accordingly, Plaintiffs have not shown that the impediments to suit contained in IDEXX's contracts with veterinary practices are so onerous as to rob those practices of their ability to bring suit.

Plaintiffs have also not put forth persuasive arguments showing that IDEXX's two main competitors, Zoetis, Inc., and Heska Corporation, are impaired or prevented from asserting antitrust claims against IDEXX.  The Complaint alleges:

> 60. There are two other entities that offer POC diagnostic analyzers, consumables, and single-use rapid test kits to veterinary practices in the United States: Zoetis, Inc. ("Zoetis") and Heska Corporation ("Heska").  As is the case with IDEXX, Zoetis analyzers use only Zoetis consumables, and the same is true of the analyzers sold by Heska.

> \* \* \*

> 71. Neither Zoetis nor Heska has had more than a 10% to 15% share of the POC Diagnostic Products market at any time relevant to the claims alleged in this Complaint.

> \* \* \*

17

76. As with the POC Diagnostic Products market, IDEXX has at all relevant times maintained at least 70% share of the Analyzer & Consumables submarket through its exclusionary conduct that has resulted in a nearly 100% retention rate.  Neither Zoetis nor Heska has had more than a 10% to 15% share of the Analyzer & Consumables submarket at any time relevant to this Complaint.

ECF No. 1 at 18-21, ¶¶ 60, 71, 76.  The Complaint also asserts that Zoetis, "a former Pfizer, Inc. subsidiary . . . spent approximately $2 billion acquiring Abaxis in 2018 to bolster its efforts in the Relevant Market and Submarkets."  ECF No. 1 at 34-35, ¶ 128.  Even when read in the light most favorable to the Plaintiffs, the Complaint's allegations (1) suggest that IDEXX's two main competitors are sufficiently capitalized to have the means to advance antitrust claims against IDEXX and (2) offer no basis to conclude that those competitors lack the ability to bring such claims.  Thus, it appears that "at least some consumers, as well as defendants' competitors, have ample incentive to bring an antitrust claim."  *Serpa Corp.*, 199 F.3d at 12.

### iii.    Whether the Alleged Antitrust Violation Caused the Plaintiffs' Injuries, and the Directness of that Connection

The first and fourth *Associated General* factors address the "causal connection" between the alleged antitrust violation and the alleged injury, and the "directness" of that causal connection.  IDEXX argues that "many factors independent from the alleged difficulty veterinarians face in switching to IDEXX's competitors readily explain the pet owners' claimed injury of paying too much to veterinarians during office visits."  ECF No. 86 at 19.  IDEXX notes that it is the veterinarians who set the prices for their services, and that a variety of factors influence those prices including "the size of a practice, the median income of customers, the labor costs for technicians, the level of competition locally, corporate consolidation in the veterinary practice

industry, the extent to which pet insurance is present, or simply the veterinarian's individual judgment about what price is appropriate." *Id.* The Plaintiffs respond that their injuries are "as [d]irect as [i]ndirect [p]urchaser [i]njuries [c]an [b]e." ECF No. 87 at 21.

The extent to which the alleged antitrust violations have caused the Plaintiffs' alleged injuries is uncertain from the Complaint. That uncertainty is consistent with the procedural posture of this case; assessing the "directness" of an alleged causal connection often requires factual development that is unavailable at the motion to dismiss stage. *See Arroyo-Melecio*, 398 F.3d at 73. Rather, "[d]ismissal at the pleadings stage is more often associated with disfavored plaintiffs" who are not consumers. *Id.* As discussed above, the Plaintiffs here have not plausibly pleaded that they qualify as purchasers in the market where they allege the market restraint has occurred.

### b. The Second *Associated General* Factor: Improper Motive

The "improper motive" factor in the *Associated General* test can be summarily resolved. It weighs in favor of standing here because the Complaint undoubtedly alleges improper motive—a fact that IDEXX appears to concede. However, this factor alone, which is present in almost every antitrust case, is insufficient to sway the *Associated General* test in Plaintiffs' favor if the other factors weigh against standing. *See Associated General*, 459 U.S. at 537 ("We are also satisfied that an allegation of improper motive, although it may support a plaintiff's . . . claim . . . , is not a panacea that will enable any complaint to withstand a motion to dismiss." (footnote omitted)); *Sullivan v. Tagliabue*, 25 F.3d 43, 47 n.7 (1st Cir. 1994) ("[T]he presence of an

improper motive on the part of the defendants is not, by itself, determinative of antitrust standing."); *Breiding*, 344 F. Supp. 3d at 456 (concluding that the improper motive factor was insufficient to overcome the other *Associated General* factors).

### c. The Fifth and Sixth *Associated General* Factors: Speculative Damages and Risk of Duplicative Recovery

The two remaining *Associated General* factors are the speculative nature of the damages (fifth factor) and the risk of duplicative recovery or complex apportionment of damages (sixth factor).  Neither factor bears on the analysis of standing with respect to equitable relief under the federal antitrust laws.  As the Supreme Court explained in *Cargill*:

> Standing analysis under § 16 will not always be identical to standing analysis under § 4.  For example, the difference in the remedy each section provides means that certain considerations relevant to a determination of standing under § 4 are not relevant under § 16.  The treble-damages remedy, if afforded to every person tangentially affected by an antitrust violation, or for all injuries that might conceivably be traced to an antitrust violation, would open the door to duplicative recoveries and to multiple lawsuits.  In order to protect against multiple lawsuits and duplicative recoveries, courts should examine other factors in addition to antitrust injury, such as the potential for duplicative recovery, the complexity of apportioning damages, and the existence of other parties that have been more directly harmed, to determine whether a party is a proper plaintiff under § 4.  Conversely, under § 16, the only remedy available is equitable in nature, and . . . the fact is that one injunction is as effective as 100, and, concomitantly, that 100 injunctions are no more effective than one.  Thus, because standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries, some of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16.

479 U.S. at 111 n.6 (internal quotation marks and citations omitted); *see also Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO, Loc. Lodge No. 1821 v. Verso Paper Corp.*, 80 F. Supp. 3d 247, 270 (D. Me. 2015) (discussing this aspect of *Cargill*).

Thus, as IDEXX expressly acknowledges, the fifth and sixth *Associated General* factors "do not apply to Plaintiffs' Sherman Act claims." ECF No. 86 at 21. *But see In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 221 (S.D.N.Y. 2019) (noting that the "principles" underlying those factors inform the Second Circuit's "efficient enforcer" analysis, even in the context of actions seeking injunctive relief). These factors are, however, relevant to the state law claims discussed below.

### 2. Conclusion with Respect to Federal Antitrust Standing

Considered holistically, the *Associated General* factors do not support federal antitrust standing for the Plaintiffs here. Accordingly, IDEXX is entitled to the dismissal of the federal antitrust claims asserted in the Complaint.

### C. State and Consumer Protection Law Claims

The Plaintiffs also seek damages and relief under the antitrust and consumer protection laws of several states. These states, called "repealer jurisdictions" have passed statutes that expressly reject the bar on indirect purchaser recovery announced by the Supreme Court in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). *See supra* note 1. Under *Illinois Brick*, and reaffirmed in *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019), indirect purchasers who are two or more steps removed from the alleged antitrust violator in a distribution chain may not sue the violator for damages under federal law. *See Kansas v. UtiliCorp. United, Inc.*, 497 U.S. 199, 207 (1990) (defining an indirect purchaser as one who is not "the immediate buyer[] from the alleged antitrust violator[]"); *see also* William Holmes & Melissa Mangiaracina, *Antitrust Law Handbook* § 9:9 (West 2023). But *Illinois Brick*'s bright-line rule does

not preclude states from enacting "repealer statutes" that permit indirect purchasers to sue for damages under that state's antitrust law. *See California v. ARC Am. Corp.*, 490 U.S. 93, 101-02 (1989) (concluding that state antitrust laws permitting indirect purchaser recovery were not preempted by federal antitrust laws); Holmes & Mangiaracina, *supra*, § 9:9.

IDEXX argues that the Plaintiffs lack antitrust standing on their state law claims under the *Associated General* test for the same reasons that they lack antitrust standing under the federal antitrust laws. IDEXX argues, specifically, that "[d]istrict courts throughout the country have held that the same *AGC* test that applies to federal claims also applies to state law antitrust claims." ECF No. 86 at 22. IDEXX also points to "harmonization provisions" that it contends are strong evidence that these states would adopt the *Associated General* test.[9] ECF No. 86 at 22; *see also* ECF No. 86 at 30 (compiling statutory "harmonization provisions" and court interpretations of the same). Based on the *Associated General* factors, IDEXX contends that the Plaintiffs do not have standing to bring their state law claims— particularly given the fifth and sixth factors of the *Associated General* test, which apply in cases involving damages. IDEXX asserts that the Plaintiffs' state claims under both antitrust and consumer protection laws should be dismissed.

The Plaintiffs "do not contest that state antitrust laws are uniform as applied to Plaintiffs' claims, and that this uniformity extends to state consumer-protection

---

[9]  The only state law antitrust claim that IDEXX acknowledges is not subject to *Associated General* is Minnesota's antitrust law. This conclusion is certainly the case; it was the precise holding of the Minnesota Supreme Court in *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 627-28 (Minn. 2007). IDEXX argues that even under the Minnesota Supreme Court's admittedly broad standard for antitrust standing, the Plaintiffs lack antitrust standing under *Lorix*.

laws." ECF No. 87 at 26. Instead, they argue that they have antitrust standing under the state laws, that indirect purchaser standing here is consistent with the repealer jurisdictions' enactment of laws overruling *Illinois Brick*, and that IDEXX has applied the antitrust standing doctrine incorrectly to the facts of this case.

The parties have not identified any First Circuit authority that addresses whether the *Associated General* factors apply uniformly when determining standing under state antitrust laws. Several out-of-circuit cases, however, have refrained from making sweeping conclusions about the applicability of the *Associated General* factors to state law claims. *See, e.g.*, *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 4955377, at *11 (N.D. Cal. Oct. 2, 2014) (concluding that, with respect to the majority of states at issue, "the authority is too uncertain to conclude that they would apply *AGC* without any modification"); *In re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883, 2009 WL 3754041, at *7 (N.D. Ill. Nov. 5, 2009) ("Most district courts that have reached the issue have concluded that whether the *AGC* standards can be applied must be determined on a state by state basis."); *see also In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1151-52 (N.D. Cal. 2009) (rejecting the defendants' arguments that *Associated General* applied across-the-board to all the state antitrust laws at issue and instead concluding that it applied only in Iowa, Nebraska, and California).

The parties' briefing on whether the *Associated General* factors control the standing issue for purposes of the state antitrust and consumer protection claims is sparse. Further, the parties have not had the opportunity to consider and address how my conclusions regarding federal antitrust standing affect the state antitrust

and consumer protection claims.  Accordingly, I deny IDEXX's motion to dismiss in part as to the state antitrust and consumer protection claims asserted in the Complaint.  This denial is, however, without prejudice to IDEXX filing a renewed motion to dismiss as to the state law antitrust and consumer protection claims within thirty (30) days, supported by a memorandum of law.

## III.  CONCLUSION

It is accordingly **ORDERED** that:

- IDEXX's Renewed Motion to Dismiss (ECF No. 86) is **GRANTED IN PART** with respect to the federal antitrust claims set forth in the Complaint (Counts 1 and 2).

- IDEXX's Renewed Motion to Dismiss (ECF No. 86) is **DENIED IN PART** without prejudice with respect to the state law antitrust and consumer protection claims set forth in the Complaint (Counts 3-43).  IDEXX may file a renewed motion to dismiss within thirty (30) days, supported by a memorandum of law.

**SO ORDERED.**

**Dated:  January 8, 2024**

_____
    **/s/ JON D. LEVY**
**CHIEF U.S. DISTRICT JUDGE**