UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| CAM YUEN et al., on behalf of themselves and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | 1:22-cv-00392-SDN |
| v. | ) ) | |
| IDEXX LABORATORIES, INC., et al., | ) ) | |
| Defendants. | ) ) | |

**ORDER ON DEFENDANTS' SECOND RENEWED MOTION TO DISMISS**

The named Plaintiffs in this putative class action are twenty-two pet owners who bring antitrust and consumer protection claims against Defendants IDEXX Laboratories, Inc., and IDEXX Distribution, Inc., providers of veterinary diagnostic products. The matter is before the Court on the Defendants' Second Renewed Motion to Dismiss (ECF No. 106). For the following reasons, the Motion is granted in part and denied in part.

**BACKGROUND**

To decide Defendants' present Motion, I take as true the well-pleaded facts alleged in the Class Action Complaint (ECF No. 1). *See Martin v. Somerset Cnty.*, 86 F.4th 938, 941 (1st Cir. 2023). The facts underlying this action are described in the Court's Order (ECF No. 103) on Defendants' First Renewed Motion to Dismiss,[1] and I do not repeat them here. In that Order, the Court granted in part Defendants' First Renewed Motion to Dismiss as to the federal claims (Counts 1 and 2), concluding Plaintiffs lacked federal

---

[1] The motion referenced here is titled "Defendants' Renewed Motion to Dismiss" (ECF No. 86). I refer to that document as the "First" such motion, to distinguish it from the Defendants' Second Renewed Motion to Dismiss (ECF No. 106) now before the Court.

antitrust standing. *See Yuen v. IDEXX Lab'ies, Inc.*, No. 2:22-cv-00392-JDL, 2024 WL 83351, at *10 (D. Me. Jan. 8, 2024). The Court denied the motion in part without prejudice as to the state law claims (Counts 3-34) and invited Defendants to file a renewed motion to dismiss as to those claims. *Id.* at *12. Defendants subsequently filed the Motion now before the Court, which seeks dismissal of all the state law claims[2] pursuant to Rule 12(b)(6).

## DISCUSSION

To evaluate a motion to dismiss under Rule 12(b)(6), courts consider "whether the well-pleaded factual allegations, viewed in the light most favorable to the plaintiff, state a claim for which relief can be granted." *Germanowski v. Harris*, 854 F.3d 68, 71 (1st Cir. 2017). A complaint will survive a motion to dismiss "when the facts alleged, [taken] as true, and the inferences they support, [drawn] in the plaintiff's favor, 'plausibly narrate a claim for relief.'" *Id.* (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012)).

Defendants' overarching argument is that the state law claims, like the federal claims, should be dismissed because Plaintiffs lack antitrust standing. As explained in the Court's earlier order, antitrust standing is a prudential doctrine—separate from Article III standing—that "seek[s] to ensure that the prospective antitrust plaintiff has suffered an injury of the kind antitrust laws were intended to prevent, such that the plaintiff is a

---

[2] Specifically, the Plaintiffs bring claims under antitrust laws of the District of Columbia and twenty-five states (Arizona, California, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin) and under consumer protection laws of the District of Columbia and thirteen states (California, Florida, Massachusetts, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Rhode Island, South Carolina, Utah, and Vermont). For ease of reference, I will refer to the District of Columbia as a "state" throughout this order.

proper party to bring a federal antitrust suit." *Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 291-93 (1st Cir. 2022). The Supreme Court in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983), described several considerations ("the *AGC* factors") for courts evaluating whether a particular plaintiff has antitrust standing under federal law:

> (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury"); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages.

*Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999) (citing *Associated Gen.*, 459 U.S. at 537-45). The First Circuit has explained that "[c]ompetitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." *Id.*

In this case, the Court has already held Plaintiffs do not meet the standard for federal antitrust standing under *AGC*. In their Complaint, Plaintiffs identify as the "Relevant Market and Submarkets" the "[Point-of-Care] Diagnostic Products market" and the submarkets for "analyzers and their compatible consumables" and "single-use rapid test kits." Class Action Compl. at 3, ¶ 3. In its earlier order, the Court concluded "the Complaint does not plausibly allege facts showing Plaintiffs are purchasers in the allegedly threatened market that is the subject of their Complaint." ECF No. 103 at 11. The Court instead reasoned that Plaintiffs' failure to plead facts indicating "one or more Plaintiffs purchased an IDEXX analyzer, consumable, or single-use rapid test kit from a veterinarian" suggested "such a transaction never occurred and that the Plaintiffs were either direct or indirect 'purchasers' of analyzers, consumables, and single-use rapid test

kits only in the sense that they purchased professional services from veterinarians who used those products." ECF No. 103 at 10-11. In other words, this Court has already concluded Plaintiffs are not direct or indirect purchasers in the market for point-of-care diagnostic products, and Plaintiffs lack federal antitrust standing under the *AGC* factors as interpreted by the First Circuit.

At this stage, the key question for the Court is whether it should dismiss some or all of the state law claims for lack of antitrust standing. "[A]ntitrust standing under state law is just that, a matter of *state* law." *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 4955377, at *7 (N.D. Cal. Oct. 2, 2014); *see also Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 914 (N.D. Cal. 2019). As a result, "[t]he *AGC* factors apply to standing inquiries under state antitrust laws only to the extent that a state has adopted them." *In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 946 F. Supp. 2d 554, 564 (E.D. La. 2013); *see also In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 540 (N.D. Ill. 2019) ("Although the Court concludes that *AGC*'s antitrust standing requirement applies in all federal antitrust cases, that does not answer whether *AGC* applies to [the p]laintiffs' claims under state law. 'While most states model their antitrust statutes and jurisprudence on federal law, they are under no obligation to do so.'" (quoting *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743 (7th Cir. 2018))); *California v. ARC Am. Corp.*, 490 U.S. 93, 105 (1989) (describing *AGC* as construing federal antitrust law and explaining that *AGC* did not "identify a federal policy against States imposing liability in addition to that imposed by federal law.").

States that explicitly reject federal limitations on indirect purchaser standing are characterized as "repealer jurisdictions," and these jurisdictions permit some indirect purchasers to recover for antitrust violations. *See Ill. Brick Co. v. Illinois*, 431 U.S. 720,

4

746-47 (1977) (prohibiting indirect purchasers from seeking damages under federal antitrust law); *cf. ARC Am. Corp.*, 490 U.S. at 101-02 (concluding federal antitrust laws do not preempt state antitrust laws that allow indirect purchaser recovery).

A federal court evaluating a state law claim must apply state substantive law. *Barton v. Clancy*, 632 F.3d 9, 17 (1st Cir. 2011). To do so, courts "look to the pronouncements of a state's highest court in order to discern the contours of that state's law." *Id.* (quoting *González Figueroa v. J.C. Penney P.R., Inc.*, 568 F.3d 313, 318 (1st Cir. 2009)). If the highest state court "has not spoken directly on the question at issue," the federal court will "predict 'how that court likely would decide the issue,' looking to the relevant statutory language, analogous decisions of the state supreme court, decisions of the lower state courts, and other reliable sources of authority." *Id.* (quoting *González Figueroa*, 568 F.3d at 318). Federal courts should "follow[] the decisions of state intermediate appellate courts in the absence of convincing evidence that the state's highest court would decide otherwise." *Torres-Ronda v. Nationwide Mut. Ins. Co.*, 18 F.4th 80, 84 (1st Cir. 2021).

Defendants' Motion engages in a state-by-state analysis, arguing that Plaintiffs lack antitrust standing under each of the applicable state laws. Specifically, Defendants argue the highest court in each relevant state would apply either the federal *AGC* factors, a proximate cause standard, or a similar test to evaluate antitrust standing under state law. According to Defendants, Plaintiffs lack the ability to bring their claims under any of these standards.

In response, Plaintiffs argue the relevant "state laws are largely the same for purposes of IDEXX's second renewed motion to dismiss." Pls.' Opp'n at 8. Plaintiffs do not appear to dispute that each state law incorporates some prudential limitations on

antitrust standing, but they contend they have antitrust standing under all the state laws. Plaintiffs identify two approaches that state courts use to evaluate antitrust standing under state law: some states "adapt the *AGC* factors to indirect purchaser claims," and some "reject *AGC* entirely." Pls.' Opp'n at 14. According to Plaintiffs, they have antitrust standing under either framework: "Either way, in repealer jurisdictions, courts allow claims in indirect purchaser lawsuits like this one." Pls.' Opp'n at 14.

In so arguing, Plaintiffs fail to directly contend with this Court's holding that they have not plausibly pleaded that they are purchasers—direct or indirect—in the market for point-of-care diagnostic products.[3] Plaintiffs emphasize that "repealer jurisdictions" have "expand[ed] the scope of plaintiffs with standing to bring antitrust claims for damages" relative to that under federal law. Pls.' Opp'n at 12. This is certainly true; many of these states have expressly rejected the federal framework for indirect purchaser claims by enacting laws that permit indirect purchasers to seek damages under state antitrust laws. But the fact that repealer jurisdictions have rejected *some* federal antitrust standing requirements—as to indirect purchasers seeking damages—does not mean that they have rejected *all* prudential limitations on who may bring antitrust claims. *See, e.g, In re Cattle & Beef Antitrust Litig*., 687 F. Supp. 3d 828, 837 (D. Minn. 2023) (explaining how *Illinois Brick* prohibited indirect purchasers from seeking damages under federal antitrust law while *AGC* imposed a version of proximate cause on antitrust claims by considering "the directness or indirectness of the asserted injury," including "the chain of causation between the [plaintiff's] injury and the alleged restraint in the market.").

---

[3] Indirect purchasers "are two or more steps removed from the antitrust violator in a distribution chain." *Apple Inc. v. Pepper*, 587 U.S. 273, 280 (2019); *accord Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207 (1990) ("[T]he consumers in this case have the status of indirect purchasers. In the distribution chain, they are not the immediate buyers from the alleged antitrust violators.").

Here, the Court has already rejected Plaintiffs' argument that they have plausibly alleged they are indirect purchasers of point-of-care diagnostic products. As a result, the key question for the Court at this stage is whether any of the state laws cited in the Class Action Complaint permit an antitrust suit where the plaintiff is not a "purchaser"—direct or indirect—in the allegedly restrained market.

### A. STATE ANTITRUST LAW CLAIMS

### 1. Plaintiffs' Claims Fail Where State High Courts Have Expressly Applied the *AGC* Factors.[4]

Federal antitrust standing principles apply to actions brought under Nebraska's Junkin Act and Consumer Protection Act. *See Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 297-98, 302 (Neb. 2006). In *Kanne*, the Nebraska Supreme Court concluded retail consumers did not have standing to bring such claims against companies that provided credit and debit card processing services to merchants. *Id.* at 296. The plaintiffs alleged the companies engaged in an impermissible "tying arrangement," resulting in heightened costs that merchants passed on to customers. *Id.* Applying the *AGC* factors to conclude the plaintiffs lacked standing, the Nebraska court reasoned in part that the retail consumers were not competitors or consumers "in the allegedly affected market, which is the business of providing debit network processing services to merchants." *Id.* at 298. Further, the court explained that Nebraska's rejection of the federal *Illinois Brick* bar on damages claims brought by indirect purchasers did not alter the result:

> Moreover, appellants are not indirect purchasers permitted to sue under *Arthur*. The plaintiffs in *Arthur* had a direct relationship with Microsoft Corporation because they were end-user licensees of Windows 98, but each had purchased Windows 98 indirectly through an intermediary. Here, appellants did not purchase the debit card services, either directly or indirectly; rather, they claim to have paid higher prices for goods resulting

---

[4] This section resolves Counts 7, 15, and 34, which arise from state laws in Nebraska and Iowa.

> from the merchants' purchase of Visa's and MasterCard's debit card
> services.

*Id.* at 301 (citation omitted) (discussing *Arthur v. Microsoft Corp.*, 676 N.W.2d 29 (Neb. 2004)). Like the plaintiffs in *Kanne*, Plaintiffs here are not direct or indirect purchasers in the allegedly affected market, and they do not have a direct relationship with Defendants.

In considering a factually similar claim to *Kanne* brought under Iowa's competition law, the Iowa Supreme Court in *Southard v. Visa U.S.A. Inc.* applied reasoning analogous to the Nebraska court to conclude retail consumers were "nonpurchasers" of the defendant's products and thereby lacked antitrust standing to sue. 734 N.W.2d 192, 196-97 (Iowa 2007). *Id.* The court explained:

> The plaintiffs bringing suit in *Comes* were indirect purchasers of the Windows 98 operating system because "Microsoft did not directly sell its products [to the plaintiffs, but the plaintiffs] ultimately obtained the products through the stream of commerce." The plaintiffs in the present action are not in a comparable position because they did not purchase, directly or indirectly, the product that is the subject of anticompetitive activity by Visa and MasterCard—debit processing services. It is clear from the petition that the plaintiffs are nonpurchasers; they simply bought merchandise from businesses that used the defendants' debit processing services.

*Id.* at 196-97 (alteration in original) (citation omitted) (discussing *Comes v. Microsoft Corp.,* 696 N.W.2d 318, 320 (Iowa 2005)). Likewise, Plaintiffs in this case "appear to" have "purchased" point-of-care diagnostic products "only in the sense that they purchased professional services from veterinarians who used those products." ECF No. 103 at 11.

Plaintiffs attempt to distinguish *Southard* and *Kanne* by explaining that the plaintiffs in those cases "were not indirect purchasers, but instead consumers of products wholly distinct from the antitrust violation." Pls.' Opp'n at 15 n.9. In so arguing, however,

Plaintiffs fail to contend with this Court's earlier conclusion that they are not purchasers in the allegedly restrained market for point-of-care diagnostic products. Plaintiffs assert that "[w]hether Plaintiffs paid supracompetitive prices for the POC Diagnostic Products themselves or for veterinary services using those products is immaterial," Pls.' Opp'n at 11, but *Southard* and *Kanne* suggest that plaintiffs' particular purchases are relevant to the antitrust standing analysis of at least some states.

Applying the foregoing principles of the facts of this case, and in keeping with the Court's earlier conclusion that the Plaintiffs have not plausibly pleaded that they are direct or indirect purchasers of point-of-care diagnostic products, I conclude Plaintiffs lack antitrust standing to bring claims against the Defendants under Nebraska's Junkin Act, Nebraska's Consumer Protection Act, and Iowa's competition law. Thus, Counts 7, 15, and 34 are dismissed.

### 2. Plaintiffs' Claims Fail Where States Harmonize State Antitrust Law with Federal Antitrust Law and Plaintiffs Have Not Identified Countervailing State Authority.[5]

I also conclude Plaintiffs lack antitrust standing in many jurisdictions where state law requires or permits courts to interpret state antitrust law in harmony with federal antitrust law.[6] Although the states' specific harmonization provisions are far from

---

[5] This section resolves Counts 5, 6, 8, 10, 11, 16, 17, 18, 22, 23, 24, 26, and 27, which arise from state laws in the District of Columbia, Illinois, Kansas, Maryland, Michigan, Nevada, New Hampshire, New Mexico, Oregon, Rhode Island, South Dakota, Utah, and West Virginia. I have already resolved the claims arising from state laws in Nebraska and Iowa, *supra* Section A.1, whose high courts have expressly applied the *AGC* factors, but I note those states also have statutory harmonization provisions. *See* Neb. Rev. Stat. Ann. § 59-829 ("When any provision of sections 59-801 to 59-831 and sections 84-211 to 84-214 or any provision of Chapter 59 is the same as or similar to the language of a federal antitrust law, the courts of this state in construing such sections or chapter shall follow the construction given to the federal law by the federal courts."); Iowa Code Ann. § 553.2 ("This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter.").

[6] Specifically, this section considers harmonization provisions that apply to the District of Columbia Antitrust Act, Illinois Antitrust Act, Kansas Restraint of Trade Act, Maryland Antitrust Statute, Michigan Antitrust Reform Act, Nevada Unfair Trade Practices Act, New Hampshire Antitrust Statute, New Mexico

monolithic, *see Lithium Ion Batteries*, 2014 WL 4955377, at *9, they do indicate a state's willingness to look to federal antitrust precedent, at least in some contexts, even where that state has rejected the federal rule as to indirect purchaser standing.

Federal district courts have sometimes concluded that "the presence of a [] harmonization provision (either statutory or common law), absent any countervailing statutory law or case law from a state appellate court, is sufficient to permit a district court to apply federal antitrust-standing law—including *AGC*—to claims brought under that state's antitrust laws."[7] *Dealer Mgmt. Sys.*, 362 F. Supp. 3d at 545 (quoting *In re Dairy*

---

Antitrust Act, Oregon Antitrust Law, Rhode Island Antitrust Act, South Dakota Antitrust Statute, Utah Antitrust Act, and West Virginia Antitrust Act. *See* D.C. Code Ann. § 28-4515 ("It is the intent of the Council of the District of Columbia that in construing this chapter, a court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes."); 740 Ill. Comp. Stat. Ann. 10/11 ("When the wording of this Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act."); Kan. Stat. Ann. § 50-163(b) ("Except as otherwise provided in subsections (d) and (e), the Kansas restraint of trade act shall be construed in harmony with ruling judicial interpretations of federal antitrust law by the United States supreme court."); Md. Code Ann., Com. Law § 11-202 ("It is the intent of the General Assembly that, in construing this subtitle, the courts be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters . . . ."); Mich. Comp. Laws Ann. § 445.784 ("It is the intent of the legislature that in construing all sections of this act, the courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes."); Nev. Rev. Stat. Ann. § 598A.050 ("The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes."); N.H. Rev. Stat. Ann. § 356:14 ("In any action or prosecution under this chapter, the courts may be guided by interpretations of the United States' antitrust laws."); N.M. Stat. Ann. § 57-1-15 ("Unless otherwise provided in the Antitrust Act, the Antitrust Act shall be construed in harmony with judicial interpretations of the federal antitrust laws. This construction shall be made to achieve uniform application of the state and federal laws prohibiting restraints of trade and monopolistic practices."); Or. Rev. Stat. Ann. § 646.715 ("The decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority in the construction of ORS 646.705 to 646.805 and 646.990."); 6 R.I. Gen. Laws Ann. § 6-36-2 ("This chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed."); S.D. Codified Laws § 37-1-22 ("It is the intent of the Legislature that in construing this chapter, the courts may use as a guide interpretations given by the federal or state courts to comparable antitrust statutes."); Utah Code Ann. § 76-10-3118 ("The Legislature intends that the courts, in construing this act, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes."); W. Va. Code Ann. § 47-18-16 ("This article shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes.").

[7] In reaching this conclusion, the district court in *In re Dairy Farmers of America, Inc.*, reasoned as follows:

> First, the plain language of the harmonization statutes at issue—disseminated by the states'
> supreme courts and/or legislatures—offers no such limitation, instructing instead that each

*Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 9 CV 3690, 2015 WL 3988488, at \*4 (N.D. Ill. June 29, 2015)). On the facts of this case, however, I need not determine whether those states would apply the *AGC* factors, or if they would apply those factors in the same manner as under federal law, to conclude that Plaintiffs lack antitrust standing under the laws of states with harmonization provisions. Instead, I merely predict that—absent a showing from Plaintiffs of state statutes or state appellate caselaw to the contrary—states with harmonization provisions would impose a market participant requirement that is analogous to that under federal law:

> [W]here state courts and legislatures have indicated that they would look to federal antitrust precedent in applying then-laws, it seems that at the very least courts would require plaintiffs in antitrust actions to plausibly allege that they were participants in the relevant product market where the alleged anti-competitive activity took place.

---

respective state's antitrust laws be read in harmony with federal antitrust laws, absent contradictory state law or policy. . . . It seems odd, then, that a district court would read a non-existent exception into a state's harmonization provision as its prediction of how the state's highest court would rule on the issue. The safer prediction is to assume that the state court would apply the plain language of the provision.

Second, . . . the fact that many state legislatures found it necessary to repeal the Supreme Court's *Illinois Brick* decision—a federal antitrust-standing opinion—implies that absent the repeal, the *Illinois Brick* antitrust-standing rule *would have* applied to the states' laws under their respective harmonization provisions (*i.e.*, if the states' harmonization provisions didn't incorporate federal antitrust-standing law, *Illinois Brick* repealer statutes wouldn't have been necessary).

Third, antitrust standing is not Article III standing; the very concept of antitrust standing, which exists *in addition to* Article III standing, is so intertwined with substantive antitrust principles that it would be counterintuitive to assume that states would not read this body of law in harmony with the remainder of the Supreme Court's substantive antitrust opinions. Indeed, the entire premise of the judicially-created "antitrust standing" inquiry stems from the fact that the plain language of the Clayton Act's standing provision is exceedingly broad, and so the Supreme Court derived a set of narrowing factors influenced by the same policies that gave birth to the antitrust laws in the first place. . . . Thus, as a threshold matter, the Court will follow the plain language of the states' harmonization provisions and adopt federal antitrust-standing law in applying the states' antitrust laws absent contrary authority.

2015 WL 3988488, at \*4-5.

*Sahagian v. Genera Corp.*, No. CV 08-7613-GW PJWX, 2009 WL 9504039, at *6 (C.D. Cal. July 6, 2009) (tentative ruling), *adopted*, 2009 WL 7185616 (C.D. Cal. July 7, 2009). Where state laws affirmatively incorporate a harmonization provision and where Plaintiffs have not cited countervailing authority from a state appellate court or state legislature, I predict that the states' highest courts would require Plaintiffs to plausibly plead that they are consumers or competitors in the allegedly restrained market.

As to the state antitrust laws at issue in this section, *see supra* note 6, Plaintiffs do not offer a single state court case to support their contention that they have standing. For those states, given the harmonization provisions and the lack of countervailing authority cited, I conclude Plaintiffs lack standing under the state antitrust laws. The reported cases that Plaintiffs cite to support their standing argument reinforce my conclusion.[8] Not one

---

[8] *See Arroyo-Melecio v. Puerto Rican Am. Ins. Co.*, 398 F.3d 56 (1st Cir. 2005) (consumers of compulsory automobile insurance suing private automobile insurers and a joint underwriting association); *Aryeh v. Canon Bus. Solutions, Inc.*, 292 P.3d 871 (Cal. 2013) (lessee of copier machines suing lessor of copier machines); *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982) (group health plan subscriber suing health insurer and organization of psychiatrists); *Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99 (Ariz. 2003) (indirect purchasers of flat glass and tobacco products suing manufacturers of those products); *California v. ARC Am. Corp.*, 490 U.S. 93 (1989) (indirect purchasers of cement suing cement producers); *Cellular Plus, Inc. v. Superior Ct.*, 18 Cal. Rptr. 2d 308 (Cal. Ct. App. 1993) (individual consumers of cellular telephone service and corporate sales agents suing cellular telephone service companies); *Cianci v. Superior Ct.*, 710 P.2d 375 (Cal. 1985) (group of physicians suing another group of physicians); *D.R. Ward Const. Co. v. Rohm & Haas Co.*, 470 F. Supp. 2d 485 (E.D. Pa. 2006) (indirect purchasers of products containing plastic additives suing manufacturers and distributors of plastic additives); *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982 (E.D. Mich. 2014) (automobile dealers and purchasers suing manufacturers or sellers of automobile Fuel Senders); *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051 (N.D. Cal. 2015) (indirect purchasers of aluminum, tantalum and film capacitors suing manufacturers of those capacitors); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011 (N.D. Cal. 2010) (purchasers of cathode ray tubes suing manufacturers of cathode ray tubes); *In re Cipro Cases I & II*, 348 P.3d 845 (Cal. 2015) (purchasers of antibiotic drug suing manufacturers of that drug); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009) (purchasers of flash memory products suing manufacturers, sellers, and distributors of flash memory); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085 (N.D. Cal. 2007) (purchasers of devices containing graphics processing units suing producers of graphics processing units); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187 (S.D.N.Y. 2019) (purchasers of cups or pods compatible with coffee brewers suing manufacturer of the same); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352 (D.R.I. 2019) (end-payor purchasers of pharmaceutical drugs suing pharmaceutical companies); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160 (D. Me. 2004) (buyers and lessees of new automobiles suing automobile companies and dealer associations); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367 (D. Mass. 2013) (health and welfare benefit funds suing drug manufacturers); *In re Pool*

of those cases involves a consumer of professional services asserting antitrust claims against an entity that provided the equipment or supplies that the professional used as part of those services. Instead, many of the cases cited involve a plaintiff who was the ultimate end-user of a product where the market for that product—or one of its physical components—was the target of the allegedly anticompetitive activity.

Because I conclude Plaintiffs lack standing where states have imposed harmonization provisions and where Plaintiffs have not cited countervailing state authority, Counts 5, 6, 8, 10, 11, 16, 17, 18, 22, 23, 24, 26, and 27 are dismissed.

### 3. The Plaintiffs' Claims Under Other States' Antitrust Laws Provide for Differing Conclusions[9]

**Arizona**

Plaintiffs lack standing under Arizona's Uniform State Antitrust Act. *See* Ariz. Rev. Stat. Ann. § 44-1401 *et seq*. Despite having a harmonization provision in its antitrust laws, the Arizona Supreme Court has allowed indirect purchaser plaintiffs to recover for antitrust violations. *Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 109 (Ariz. 2003) ("While the Supreme Court may have wished to protect federal courts from the burden of

---

*Prod. Distribution Mkt. Antitrust Litig.*, 946 F. Supp. 2d 554 (E.D. La. 2013) (pool owners suing pool product manufacturers and distributors); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) (purchasers of products containing TFT-LCD panels suing manufacturers, sellers, and distributors of TFT-LCD panels); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143 (E.D. Pa. 2009) (employee benefit plans suing drug producers and distributors); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) (milk producers suing cheese makers who allegedly interfered with milk prices); *Lorix v. Crompton Corp.*, 736 N.W.2d 619 (Minn. 2007) (purchaser of tires suing manufacturers of rubber-processing chemicals that may be present in the tires); *Moniz v. Bayer Corp.*, 484 F. Supp. 2d 228 (D. Mass. 2007) (indirect purchasers of rubber and urethane products suing producers of those products); *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199 (9th Cir. 2014) (licensee suing licensor); *Teague v. Bayer AG*, 671 S.E.2d 550 (N.C. Ct. App. 2009) (purchaser of consumer products containing ethylene propylene diene monomer elastomers suing manufacturers of ethylene propylene diene monomer elastomers).

[9] This section resolves Counts 3, 4, 9, 12, 13, 19, 20, 21, 25, and 28, which arise from state laws in Arizona California, Maine, Minnesota, Mississippi, New York, North Carolina, North Dakota, Tennessee, and Wisconsin.

resolving nationwide class actions potentially involving hundreds of thousands of indirect purchaser plaintiffs, this court is confident that Arizona's courts are up to the task of ascertaining damages and protecting Arizona citizens."). However, in reconciling the *Bunker's Glass* decision with the statutory harmonization provision, the Arizona Supreme Court reasoned that the act aimed for uniformity with the federal law for "the standard of conduct required, not necessarily [the] procedural matters such as who may bring an action for injuries caused by violations of the standard of conduct." *Id*. at 106. The Arizona court cited the Iowa Supreme Court's ruling in *Comes v. Microsoft Corp*., 646 N.W.2d 440 (Iowa 2002), holding the state's harmonization provision was satisfied where the court applied it to the conduct governed by the law as opposed to determining the appropriate entity to file suit. *Id*.

In accordance with my previous finding that Plaintiffs do not adequately plead they are participants in the allegedly restrained market, what distinguishes this matter from *Bunker's Glass* is that the class action suits in that matter involved end-user purchasers of products as opposed to purchasers of services. *Id*. at 102 ("[A] direct purchaser who resells the goods may pass on the overcharge from the manufacturer to later (indirect) purchasers by raising the price of the item."); *see also Comes*, 646 N.W.2d at 442 ("The [c]lass asserted that by virtue of its status as end-user licensees, it incurred a monopoly price charged by Microsoft for use of Windows 98."). Without needing to decide whether Arizona's highest court would strictly apply the *AGC* factors to evaluate indirect plaintiffs' standing, I predict the court would at least require an indirect plaintiff to show that it is a participant in the allegedly restrained market with more than an assertion of overcharges for professional services, which Plaintiffs here have not done. Accordingly, Count 3 is dismissed.

14

**California**

Plaintiffs lack standing under California's Cartwright Act. Calif. Bus. & Prof.Code § 16750 subd. (a). The contention that California law permits indirect purchasers to pursue antitrust violations is correct, *see id.* ("[A]ction[s] may be brought by any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, regardless of whether such injured person dealt directly or indirectly with the defendant."), however, the repeal provision does not necessitate a finding that purchasers of professional services are market participants for the products used by professionals in providing that service. California state courts and federal courts interpreting California's Cartwright Act frequently apply *AGC* factors to determine whether a plaintiff has suffered an antitrust injury. *See, e.g.*, *Vinci v. Waste Mgmt., Inc.*, 43 Cal. Rptr. 2d 337, 338 n.1 (Cal. Ct. App. 1995) ("[T]he California courts look to cases construing the federal antitrust laws for guidance in interpreting the Cartwright Act."); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) (applying the AGC factors to a plaintiff's state antitrust claims while noting the Cartwright Act expands antitrust injury under California state law); *Ahn v. Stewart Title Guar. Co.*, 310 Cal. Rptr. 3d 595, 606 (2023) (using federal antitrust law to support a conclusion that the plaintiff did not suffer an antitrust injury); *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Group PLC*, 22 F.4th 103, 120-21 (2d Cir. 2021) (finding California courts substantially incorporate the *AGC* factors).

Plaintiffs make two arguments regarding California antitrust law. First, Plaintiffs contest the application of *AGC* factors to the Cartwright Act. The cases cited above and those cited in Plaintiffs' Response Brief that apply *AGC* factors to address standing under

the Cartwright Act defeat this argument. Although California courts may apply antitrust standing requirements less stringently than federal law, the cases Plaintiffs cite do not support a complete rejection of *AGC* under the state's antitrust law.

Second, Plaintiffs argue California does not impose a market participant requirement in accordance with federal antitrust law, and that California permits indirect purchasers' antitrust claims where plaintiff-buyers make purchases in markets that are "inextricably linked" to the alleged antitrust violations. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011 (N.D. Cal. 2010) (finding allegations that a class of plaintiffs paid higher prices for products due to the defendants' conspiracy was a sufficient antitrust injury to warrant relief under the Cartwright Act and in other repealer jurisdictions). Plaintiffs cite to various cases in the Northern District of California to reiterate this principle. *See* ECF No. 108 at 12. Plaintiffs' claim under the Cartwright act fails for the same reasons previously analyzed—none of the cases cited demonstrate that a purchaser of professional services is an appropriate plaintiff to bring antitrust claims against an entity that supplied professionals with products used to perform that service. Thus, I predict the state's highest court would find Plaintiffs in this matter do not have standing to bring this claim under the Cartwright Act. Plaintiffs do not cite to any California authority to indicate a contrary conclusion. Count 4 is dismissed.

**Maine**

Plaintiffs lack standing under Maine's Antitrust Act. *See* 10 M.R.S. § 1101 et seq. The Law Court has explained that Maine looks to federal antitrust law to construe the state antitrust statute. *McKinnon v. Honeywell Int'l, Inc.*, 2009 ME 69, ¶ 19, 977 A.2d 420; *accord Davric Me. Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000) ("We have noted that the 'Maine antitrust statutes parallel the Sherman Act,' and thus have analyzed

claims thereunder according to the doctrines developed in relation to federal law." (quoting *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 998 F.2d 1073, 1081 (1st Cir. 1993))). A decision from the Maine Superior Court has indicated:

> It is probable that the Maine Law Court, if presented with this issue, would look to the *Associated General Contractors* factors in determining standing under Maine's antitrust laws and would apply those factors except to the extent that those factors cannot be reconciled with the legislature's adoption of the *Illinois Brick* repealer.

*Knowles v. Visa U.S.A., Inc.*, No. CIV.A. CV-03-707, 2004 WL 2475284, at *5 (Me. Super. Ct. Oct. 20, 2004). Although "a complete reading of *Knowles* makes apparent that its application of *AGC* is not in lockstep with federal precedents," *Keurig*, 383 F. Supp. at 259, the *Knowles* court did emphasize that the availability of other potential plaintiffs cut against standing in that case. *Knowles*, 2004 WL 2475284, at *6. Here, the Court has already concluded "at least some consumers, as well as defendants' competitors, have ample incentive to bring an antitrust claim." ECF No. 103 at 18 (quoting *Serpa Corp.*, 199 F.3d at 12). The favorable citation to the *AGC* factors in *Knowles*, and particularly the possibility of alternative plaintiffs in this case, supports a finding that Plaintiffs here lack standing to bring their claim under Maine's antitrust act.

Additionally, other Maine state courts have considered whether the plaintiff is a consumer or competitor in the allegedly restrained market to evaluate antitrust standing. *See Lunny v. H. A. Mapes*, No. BCD-CV-11-20, 2011 Me. Bus. & Consumer LEXIS 14, at *14 (reasoning that plaintiff "does not allege injury as a competitor or purchaser and therefore lacks standing to pursue such a claim in this context."); *Old Town Util. & Tech. Park v. Mfgr*, No. BCD-RE-17-11, 2018 Me. Bus. & Consumer LEXIS 6, at *23-24 (reasoning that plaintiffs are not consumers or competitors in the allegedly restrained market and explaining "[t]he 'presumptive[ly] proper' plaintiff to allege an antitrust

injury 'is a customer who obtains services in the threatened market or a competitor who seeks to serve that market'" (quoting *SAS of P.R., Inc. v. P.R. Tel. Co.*, 48 F.3d 39, 44 (1st Cir. 1995))). For these reasons, I predict the Law Court would conclude Plaintiffs in this case do not have standing to bring their claim under Maine's antitrust law. Plaintiffs have not cited any Maine state authority to indicate a contrary conclusion. Count 9 is dismissed.

## Minnesota

Plaintiffs have standing under Minnesota antitrust law. *See* Minn. Stat. Ann. § 325D.49 et seq. The Minnesota Supreme Court expressly rejects strict application of the *AGC* factors to the state's antitrust law, particularly in determining standing limitations. *See Lorix v. Crompton Corp.*, 736 N.W.2d 619 (Minn. 2007). Although the court has explained that, because the "purposes of Minnesota and federal antitrust law are the same, it is sensible to interpret them consistently," *id.* at 626, the court also "counsels against a rigid market-participant requirement," *id.* at 630 (citing *State by Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490, 496 (Minn. 1996) (finding Blue Cross had "standing to sue in antitrust based on the increased amounts it paid for healthcare")). The Minnesota Supreme Court reinforces its *Humphrey* decision in *Grp. Health Plan, Inc. v. Philip Morris Inc.*, where it similarly held Minnesota health maintenance organizations ("HMOs") had antitrust standing to sue cigarette manufacturers for "increased health care services [the HMOs] provided to their members as a result tobacco-related illnesses." 621 N.W.2d 2, 4 (Minn. 2001). There, the court found the "any person" language illustrates an intent that the statute was not limited to purchasers of the defendant's goods or services. *Id.* at 10 (citing *Van Dyke v. St. Paul Fire & Marine Ins. Co.*, 448 N.E.2d 357 (Mass. 1983)). Thus, Minnesota's liberal application of *AGC* does not bar Plaintiffs' suit

in this matter nor is there a market participant requirement that would prohibit Plaintiffs from proceeding.

Minnesota does reject antitrust standing where a plaintiff's injury is "too remote and speculative," s*ee Lorix*, 736 N.W.2d at 632, however, such is not the case here. And although another district court determined that a class of indirect plaintiffs lacked standing under Minnesota antitrust law, the facts of that case are inapposite to those at hand. *See Dairy Farmers*, 2015 WL 3988488 at *11 (finding indirect purchasers of milk futures lacked standing under Minnesota antitrust law). The *Dairy Farmers* court found the plaintiffs "did not purchase, directly or indirectly, any product or service provided by or manufactured with components from the defendants," *id.* (citing *Lorix*, 736 N.W.2d at 632 and *Gutzwiller v. Visa USA, Inc.*, No. C4-04-08, 2004 WL 2114991 (Minn. Dist. Ct. Sept. 15, 2004)), and thereby lacked standing to sue the defendants.

Unlike the plaintiffs in *Dairy Farmers*, Plaintiffs here plead a "relatively focused" connection between the alleged injury and the antitrust violation, more akin to the plaintiffs in *Lorix. See id.* Plaintiffs claim overcharges for veterinary services resulting from pass on costs caused by Defendants' overcharging for POC diagnostic products. As illustrated in *Group Health*, Minnesota's highest court explicitly finds standing in matters involving purchasers of healthcare services. *See Grp. Health*, 621 N.W.2d at 10. Therefore, I predict Minnesota's high court would find Plaintiffs have pleaded sufficient facts to indicate they have standing under the state's antitrust law. Count 12 remains.

**Mississippi**

Plaintiffs lack antitrust standing under Mississippi's Antitrust Law. *See* Miss. Code Ann. § 75-21-1 *et seq.*  The Mississippi Supreme Court has cited favorably to federal precedent addressing antitrust standing principles. *See Owens Corning v. R.J. Reynolds*

*Tobacco Co.*, 868 So. 2d 331, 344 (Miss. 2004); *see also In re Dynamic Random Access Memory (Dram) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1095 (N.D. Cal. 2007) (acknowledging Mississippi's highest court "has previously looked to federal law in interpreting the state's antitrust statute" (citing *Harrah's Vicksburg Corp. v. Pennebaker*, 812 So. 2d 163 (Miss. 2001))). In accordance with my previous finding that Plaintiffs do not adequately plead they are participants in the allegedly restrained market, I predict that Mississippi's high court also would require a plaintiff to show that it is a market participant beyond merely purchasing professional services from an entity experiencing the alleged antitrust harm. Plaintiffs have not cited any Mississippi state authority to indicate a contrary conclusion. Count 13 is dismissed.

**New York**

Plaintiffs lack antitrust standing under the New York Donnelly Act. N.Y. Gen. Bus. Law § 349 *et seq.* The New York Court of Appeals has noted that the Donnelly Act "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result." *X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 518 (1994). Several federal courts considering the matter also conclude New York's highest court likely would apply federal antitrust standing frameworks to Donnelly Act claims. *See, e.g., Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 81–82 (2d Cir. 2013) ("We see no reason . . . to interpret the Donnelly Act differently than the Sherman Act with regard to antitrust standing."); *Oliver v. Am. Express Co.*, No. 19-cv-566NGGSMG, 2020 WL 2079510, at *14 (E.D.N.Y. Apr. 30, 2020); *In re Keurig*, 383 F. Supp. 3d at 260; *Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*, No. 13-cv-01180-BLF, 2015 WL 4755335, at *20 (N.D. Cal. Aug. 11, 2015); *Dairy Farmers*, 2015 WL 3988488, at *13-*14.

Plaintiffs have not pointed to any authority that compels a different analysis here. Therefore, I predict that New York's highest court would evaluate antitrust standing in this case in a manner similar to the federal framework and, for the reasons concerning Plaintiffs' failure to adequately plead they are market participants, determine Plaintiffs lack standing in this matter. Count 19 is dismissed.

## North Carolina

Although in the past North Carolina courts applied the *AGC* factors in some capacity, *see Crouch v. Crompton Corp.*, No. 02 CVS 4375, 2004 WL 2414027, at *24 (N.C. Super. Ct. Oct. 28, 2004), the more recent case law indicates the state courts decline to apply the *AGC* factors to the state's antitrust law. For example, in *Crouch*, an intermediate state appellate court previously applied a modified version of the *AGC* factors to determine whether a plaintiff had standing under the state's antitrust provisions. *Crouch*, 2004 WL 2414027, at *24. Since *Crouch*, however, North Carolina courts declined to strictly apply the *AGC* factors and now apply a modified version of federal antitrust standing principles. *See, e.g., Teague v. Bayer AG*, 671 S.E.2d 550, 557 (N.C. Ct. App. 2009) ("*AGC* factors do not apply in determining which indirect purchasers have standing to sue under the North Carolina antitrust statutes."); *Dicesare v. Charlotte-Mecklenburg Hosp. Auth.*, No. 16 CVS 16404, 2017 WL 1359599, at *8 (N.C. Super. Ct. Apr. 11, 2017) ("Plaintiffs are not required at the pleading stage to prove a causal chain between the Hospital's challenged conduct and Plaintiffs' alleged injury.").

North Carolina also finds an indirect plaintiff that is harmed by paying higher costs for healthcare services is sufficiently injured to bring forth an antitrust suit. *See id.* at *9 ("Plaintiffs expressly allege that the higher prices [the p]laintiffs pay for insurance and

healthcare are the result of the Anti–Steering Provisions imposed by the Hospital . . . and thereby increase [the p]laintiffs' healthcare costs."). Hence, an analysis of North Carolina jurisprudence demonstrates the courts now reject application of the *AGC* factors, and do not require plaintiffs to be a market participant in accordance with the federal antitrust standing principles.[10] Thus, I predict North Carolina's highest court would find Plaintiffs in this matter have antitrust standing. Count 20 remains.

## North Dakota

Plaintiffs lack standing under the North Dakota Uniform State Antitrust Act. *See* N.D. Cent. Code Ann. § 51-08.1-01 *et seq*. A lower North Dakota state court has applied federal antitrust standing principles to evaluate standing under the state law. *Beckler v. Visa U.S.A., Inc.*, No. CIV. 09-04-C-00030, 2004 WL 2475100, at *4 (N.D. Dist. Ct. Sept. 21, 2004) (considering "antitrust standing principles identified in *Associated General Contractors*"); *see also Oliver v. Am. Express Co.*, No. 19CV00566NGGSJB, 2021 WL 386749, at *7 (E.D.N.Y. Feb. 1, 2021) (citing *Beckler* to grant a defendant's motion for judgment on the pleadings as to a North Dakota state antitrust law claim after the defendant argued that plaintiffs were "not indirect purchasers under . . . North Dakota law and therefore lack[ed] standing"). In accordance with my previous finding that Plaintiffs do not adequately plead they are participants in the allegedly restrained market, I predict that North Dakota's high court would require a plaintiff to show injury beyond

---

[10] The *Dairy Farmers* court's interpretation of North Carolina antitrust law does not convince me that the state's high court would find a different conclusion in this matter. While the federal court in *Dairy Farms* described *Teague* as a "sometimes-dubious and often-difficult-to-follow analysis," and chose to rely on *Crouch* in its interpretation of the law, *Dairy Farmers*, 2015 WL 3988488, at *15, such discretion is not within the authority of federal courts. As a later federal court explains, "a federal court's view that a state appellate court decision is wrongly decided (or would lead to results with which the federal court would disagree) is not grounds for the federal court to ignore the state court's ruling." *Oliver*, 2020 WL 2079510 at *14 n.5.

merely purchasing professional services from an entity being overcharged for products. Plaintiffs do not cite any North Dakota state authority to indicate a contrary conclusion. Count 21 is dismissed.

## Tennessee

Plaintiffs lack standing under Tennessee's antitrust provisions (the Tennessee Trade Practices Act (TTPA)). *See* Tenn. Code Ann. § 47-25-101 *et seq*. The Tennessee Supreme Court has explicitly rejected the *Illinois Brick* analysis and many of the factors the Supreme Court considered to disallow indirect purchasers in that matter, and instead applies a "substantial effects" standard to determine if a case falls within the scope of the TTPA. *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 519-20, 523 (Tenn. 2005). Nonetheless, despite the state's rejection of many of the principles underlying the federal analysis, Plaintiffs' claims in this matter fail as "it is well settled that the TTPA applies only to tangible goods, not intangible services." *Jones v. Varsity Brands, LLC*, 2023 WL 5662590, at *5 (W.D. Tenn. Aug. 31, 2023) (internal citations omitted) (citing *Bennett v. Visa U.S.A., Inc.*, 198 S.W.3d 747, 751 (Tenn. Ct. App. 2006) and *McAdoo Cont'rs, Inc. v. Harris*, 439 S.W.2d 594 (Tenn. 1969)). Accordingly, Plaintiffs' allegations of antitrust violations for the overcharge of professional services are insufficient to hold the Defendants liable under Tennessee's antitrust law. Count 25 is dismissed.

## Wisconsin

Plaintiffs lack standing under the Wisconsin Antitrust Act. *See* Wis. Stat. Ann. § 133.01 *et seq*. Wisconsin's high court follows federal antitrust law to assess violations under the state's own antitrust provisions. *See State v. Waste Mgmt. of Wis., Inc.*, 261 N.W.2d 147, 155 (Wis. 1978) ("[W]hat amounts to a conspiracy in restraint of trade under

the Sherman Act amounts to a conspiracy in restraint of trade under the Wisconsin antitrust act."); *see also Westowne Shoes, Inc. v. Brown Grp., Inc.*, 104 F.3d 994, 998 (7th Cir. 1997) ("[T]he Supreme Court of Wisconsin has ruled that the decisions of the federal courts interpreting federal antitrust law shall control the interpretation of Wisconsin's antitrust law."); *Ashley Furniture Indus., Inc. v. Packaging Corp. of Am.*, 275 F. Supp. 3d 957, 968–69 (W.D. Wis. 2017) ("Wisconsin courts traditionally look to federal law to interpret substantive violations of the Wisconsin antitrust statutes."); *Strang v. Visa U.S.A., Inc.*, No. 03 CV 011323, 2005 WL 1403769, at *3 (Wis. Cir. Ct. Feb. 8, 2005) ("I suspect that if faced with this issue, our appellate courts would look to the[ *AGC*] factors for guidance in assessing an indirect or remote purchaser's standing.").

Federal courts are split on the issue of whether Wisconsin would apply the *AGC* factors to determine standing under the state's antitrust law. Some courts decline to apply *AGC* factors to Wisconsin law. *See, e.g.*, *Los Gatos Mercantile, Inc*, 2015 WL 4755335, at *19; *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187 (S.D.N.Y. 2019). Generally, these courts rely on the Wisconsin Court of Appeals's decision in *Obstetrical & Gynecological Assocs. of Neenah, S.C. v. Landig*, where the court held, without consulting the *AGC* factors, that an "end-consumer" plaintiff had standing. 384 N.W.2d 719, 723-24 (Wis. Ct. App. 1986) ("[The Wisconsin antitrust law] explicitly allows any person injured directly *or indirectly* to sue upon this statute."). Other courts find the state's high court would apply the *AGC* factors to determine antitrust standing. *See, e.g.*, *Dealer Mgmt. Sys.*, 362 F. Supp. 3d at 545; *Oliver*, 2021 WL 386749, at *7; *Cattle & Beef*, 687 F. Supp. 3d at 828. These courts tend to rely on the *Strang* decision to apply the *AGC* factors to the state's antitrust laws. *See Strang*, 2005 WL 1403769, at *3. Courts taking the latter position add more weight to the fact that *Strang*

is more recent than *Landig* and the fact that the Wisconsin Supreme Court has not expressed a rejection of the *Strang* decision. I agree with the latter position based on the aforementioned reasons coupled with the state supreme court's principle to look to federal interpretations of antitrust law. Thus, I predict the Wisconsin's high court would find Plaintiffs lack antitrust standing in this matter. Count 28 is dismissed.

## B. STATE CONSUMER PROTECTION LAW CLAIMS

### 1. Plaintiffs' Consumer Protection Claims Fail in States That Apply the *AGC* factors to Antitrust Claims[11]

Plaintiffs assert state consumer protection claims under 16 states' laws. The parties dispute whether Plaintiffs also must establish antitrust standing or raise additional allegations to pursue the state consumer protection law claims. Some courts have applied the *AGC* factors to state consumer protection law claims that follow federal antitrust principles where a plaintiff pleads such claims with the same basis as the plaintiff's claims for anticompetitive conduct. *See Cattle & Beef*, 687 F. Supp. 3d at 843 (citing *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1142 (N.D. Cal. 2008); *see also Dairy Farmers*, 2015 WL 3988488 (holding a plaintiff cannot "repackage" its antitrust claims into consumer protection claims under Florida law); *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 903 F. Supp. 2d 880 (C.D. Cal. 2012) (dismissing a claim under California's unfair competition law where a plaintiff lacked standing for its antitrust claim and failed to make a distinct argument for its consumer protection claim); *cf. In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307, 360 (D.R.I. 2017) (finding a class action plaintiffs' complaint was sufficient under Fed. R. Civ. P. 8(a)(2) without requiring the plaintiffs to raise facts for each individual element of the state consumer protection claims"); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503-DJC, 2015 WL 5458570, at *15 (D. Mass. Sept. 16, 2015) (rejecting an attempt by the "[d]efendants [to] fault the end payors for failing to

---

[11] This section resolves Counts 29, 30, 35, 36, 37, 39, and 41, which arise from state consumer protection law claims in in California, District of Columbia, Nevada, New Hampshire, New Mexico, Rhode Island, and Utah. Count 34 under Nebraska's consumer protection law is resolved in Section A.1, above. Both parties agree that Plaintiffs' claim (Count 42) under the Utah Unfair Practices Act should be dismissed. ECF No. 87 at 23.

allege specific facts to satisfy the unique elements of each state's laws or to plead causation as required by state consumer protection and unjust enrichment law").

I will employ a similar analysis in this matter for two reasons. First, like the plaintiffs in *Cattle & Beef*, Plaintiffs in this matter assert their consumer protection claims with the same basis as their claims for the alleged anticompetitive conduct. Second, while Plaintiffs allege in the Complaint that Defendants' conduct amounts to deceptive practices, (ECF No. 1 at 72-89), Plaintiffs argue in their Response in Opposition to Defendants' Renewed Motion to Dismiss certain consumer protection claims do not require allegations of deceptive or misleading conduct, (ECF No. 108 at 21). Nonetheless, Plaintiffs assert these consumer protection claims with the same factual and theoretical basis as their other consumer protection claims, and their bald references in the Complaint, that Defendants' conduct is deceptive is insufficient to validly raise consumer protection claims. Therefore, because Plaintiffs' consumer protection allegations appear to be based on anticompetitive conduct, I apply federal standing principles to Plaintiffs' consumer protection claims under states that apply, or that I predict would apply, the federal principles to their antitrust laws. *Cattle & Beef*, 687 F. Supp. 3d at 843; *cf. In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, No. 19-md-02918-MMC, 2021 WL 4306018, at \*13 (N.D. Cal. Sept. 22, 2021) (denying dismissal of the plaintiffs' state consumer protection claims where the plaintiffs satisfied the *AGC* factors to meet antitrust standing requirements). Accordingly, Counts 29, 30, 35, 36, 37, 39, and 41 are dismissed.

**Nevada**

Due to Plaintiffs' failure to adequately raise allegations of deceptive conduct, Plaintiffs' claim under the Nevada Deceptive Trade Practices Act ("NDTPA") also

warrants dismissal. *See* Nev. Rev. Stat. § 598.0903, *et seq.*; *cf. In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198 (S.D.N.Y. 2012) (finding a plaintiff's claim is sufficient under the NDTPA where the plaintiff raises allegations of fraudulent conduct); *In re Packaged Seafood Products Antitrust Litig.*, 242 F. Supp. 3d 1033 (S.D. Cal. 2017) (similar). Defendants argue Plaintiffs' claim under the NDTPA applies only to elderly or disabled persons. ECF No. 106 at 23. Plaintiffs contest this argument, or, in the alternative, request leave to amend to assert their claim under a different section of Nevada's consumer protection laws, Nev. Rev. Stat. § 41.600, claiming they have alleged enough facts to put defendants on notice of such a claim. ECF No. 108 at 18. Nonetheless, Plaintiffs have failed to plausibly raise an allegation of deceptive conduct as required under the NDTPA. Any claim made pursuant to Section 41.600 of the NDTPA would be futile, as the basis for such a claim would be the same as Plaintiffs' claim under Nevada's antitrust law, which, as explained above, *supra* A.2, fails due to Nevada's harmonization provision**.** Accordingly, I deny Plaintiffs' leave to amend and dismiss Count 35.

### 2. Plaintiffs' Remaining Consumer Protection Claims Provide for Differing Conclusions[12]

**Florida**

Plaintiffs' claim fails under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). *See* Fla. Stat. § 501.201(2) *et seq.* An intermediate appellate court in Florida held that indirect purchasers are proper plaintiffs to sue under the FDUTPA. *See Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100 (Fla. Dist. Ct. App. 1996). In so holding, however, the *Mack* court explained that Florida's harmonization provision "should be

---

[12] This section resolves Counts 14, 31, 32, 33, 38, 40, and 43, which arise from state consumer protection law claims under Missouri, Florida, Massachusetts, Montana, North Carolina, South Carolina, and Vermont consumer protection laws.

interpreted to mean that, in determining whether particular conduct violates the [FDUTPA], a court should consider whether the FTC and federal courts deem such conduct to be an unfair method of competition or an unconscionable, unfair or deceptive act or practice"; in other words the harmonization provision "is concerned with [defining] unlawful conduct *not* who may sue." *Id.* at 104; *see* Fla. Stat. § 501.204(2). As such, federal courts interpreting the Florida antitrust law apply federal principles to define alleged violations and determine standing. *See Oliver*, 2020 WL 2079510, at *17 (citations omitted); *QSGI, Inc. v. IBM Glob. Fin.*, No. 11-80880-CIV, 2012 WL 1150402, at *2 (S.D. Fla. Mar. 14, 2012) (citing *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 n.11 (11th Cir. 1998) ("Federal and Florida antitrust laws are analyzed under the same rules and case law.")). Therefore, while the FDUTPA allows indirect purchaser suits, it does not negate the market participant requirement in accordance with federal law when a plaintiff alleges anticompetitive conduct. *See Mack*, 673 So. at 104. Accordingly, because Plaintiffs failed to adequately raise facts demonstrating they participated in the relevant market, *see* ECF No. 103, Count 31 is dismissed.

**Massachusetts**

Plaintiffs' claim fails under the Massachusetts Consumer Protection Act. *See* Mass. Gen. Laws. Ch. 93a § 1 *et seq.* Claims pursuant to Massachusetts consumer protection law must allege that the relevant transaction and actions "occurred primarily and substantially" within in the state. *Oliver*, 2021 WL 386749, at *8 (citing *Bushkin Assocs., Inc. v. Raytheon Co.*, 473 N.E.2d 662, 671 (Mass. 1985)). The "primarily and substantially" test "requires . . . a claim under the state's consumer protection law . . . show that 'the center of gravity of the circumstances that [gave] rise to the claim [occurred] primarily and substantially within the Commonwealth.'" *Id.* (citing *Fishman*

*Transducers, Inc. v. Paul*, 684 F.3d 187, 197 (1st Cir. 2012)). Plaintiffs' allegations here assert Defendants' conduct has a substantial interstate impact and not one primarily and substantially in Massachusetts. As the First Circuit concluded in *Paul*, "[w]here wrongdoing is not focused on Massachusetts but has relevant and substantial impact across the country, the 'primarily' requirement . . . cannot be satisfied." *Paul*, 684 F.3d at 197. Therefore, Count 32 is dismissed.

**Missouri**

Plaintiffs adequately plead a claim under the Missouri Merchandising Practices Act ("MMPA"). *See* Mo. Rev. Stat. § 407.010 *et seq*. The Missouri Supreme Court explicitly holds that an indirect purchaser can recover under the MMPA. *See Gibbons v. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007). Although one federal court concluded that because *Gibbons* is based on the issue of privity between the parties, Missouri would reject indirect purchaser standing in the antitrust context, *see In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 701-02 (E.D. Pa. 2014), *amended on other grounds*, 2015 WL 12910728 (E.D. Pa. Apr. 14, 2015), I do not find this distinction persuasive. In *Conway v. CitiMortgage, Inc.*, the Missouri Supreme Court affirmed its decision in *Gibbons* to allow indirect plaintiffs to pursue consumer protection claims. 438 S.W.3d 410 (Mo. 2014). And more recent federal court decisions have interpreted *Gibbons*'s green light to indirect plaintiffs to pursue consumer protection claims to mean federal principles do not apply to the MMPA. *See, e.g., In re Fragrance Direct Purchaser Antitrust Litig.*, No. 2:23-02174, 2025 WL 579639, at *20 (D.N.J. Feb. 21, 2025); *Pool Products*, 946 F. Supp. 2d at 571 ("[T]he Missouri legislature has expressed no intent to incorporate federal antitrust standing limits into the MMPA[,] and the Missouri Supreme Court has expressly allowed suit by indirect purchasers under the

MMPA. . . ."). Relevantly, the MMPA specifically construes "merchandise" to include services. *See* Mo. Rev. Stat. § 407.010(4). Accordingly, I predict the Missouri Supreme Court would not apply federal antitrust standing principles to the state's consumer protection laws and would consider these Plaintiffs as market participants. Count 14 remains.

**Montana**

Plaintiffs' claim fails under both relevant provisions of the Montana Unfair Trade Practices Act ("MUTPA"). *See* Mont. Code. Ann. §§ 30-14-103 *et seq.*, 30-14-201 *et seq.* Federal courts interpreting Section 30-14-201 of the MUTPA generally apply federal standing principles to the state provisions. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1187 (N.D. Cal. 2009); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-01819 CW, 2010 WL 5094289 (N.D. Cal. Dec. 8, 2010); *Miami Products & Chem. Co. v. Olin Corp.*, 546 F.Supp.3d 223 (W.D.N.Y. 2021). These courts rely on the Montana Supreme Court's decision in *Smith v. Video Lottery Consultants, Inc.*, where the court held it "will give due weight to the federal courts' interpretation of this type of alleged antitrust violation." 858 P.2d 11, 13 (Mont. 1993). Moreover, as the *TFT-LCD* court noted, the standing provisions of the MUTPA and the Sherman Act are nearly identical. *TFT-LCD*, 599 F. Supp. 2d at 1187. Thus, I find federal principles apply to assessing Plaintiffs' claim under Section 30-14-201 of the MUTPA. Accordingly, Plaintiffs' claim fails under this portion of the provision for the reasons outlined above, *supra* A.2—A.3.

Regarding Section 30-14-101 of the MUTPA, Plaintiffs are not "consumers" as defined by the provision. *See Miami Products*, 546 F.Supp.3d at 234 (explaining "consumer" is "a person who purchases or leases goods, services, real property, or

information primarily for personal, family, or household purposes" under the MUTPA). The Supreme Court of Montana has held that the purchase of goods "entirely for business purposes" does "not come within the statutory definition of a purchase or lease of goods primarily for personal, family or household purposes." *Id.* (citing *Doll v. Major Muffler Centers, Inc.*, 687 P.2d 48, 52 (1984)). Thus, Plaintiffs, as purchasers of veterinary services, are not consumers under Section 30-14-101. For these reasons, Count 33 is dismissed.

**South Carolina**

Plaintiffs' claim fails under the South Carolina Unfair Trade Practices Act ("SCUTPA"). *See* S.C. Code Ann. § 39-5-10 *et seq.* "South Carolina has long adhered to a policy of following federal precedents in matters relating to state trade regulation enforcement." *Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters., Inc.*, 672 F. Supp. 1489, 1521 (D.S.C. 1987), *aff'd*, 846 F.2d 70 (4th Cir. 1988); *In re Wiring Device Antitrust Litig.*, 498 F.Supp. 79, 87 (E.D.N.Y.1980) ("South Carolina policy [] state[s that its] antitrust laws [should] be interpreted consistently with federal antitrust precedent."). Moreover, the SCUTPA states explicitly that its consumer protection laws "will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts. . . ." S.C. Code Ann. § 39-5-10(b); *see also In re Microsoft Corp. Antitrust Litig.*, 401 F. Supp. 2d 461, 464 (D. Md. 2005) (rejecting a plaintiff's attempt to "circumvent South Carolina's rule that indirect purchasers may not recover under state antitrust laws by recasting his claim as a common law claim for 'unjust enrichment.'"). Accordingly, because of the state's harmonization provision, Plaintiffs in this matter do not adequately allege they participate in the relevant market to warrant relief for anticompetitive conduct under the SCUTPA.  *See* ECF No. 103. Count 40 is dismissed.

**North Carolina**

Because I hold that North Carolina's antitrust laws will not bar Plaintiffs in this matter, I predict North Carolina's consumer protection laws would permit Plaintiffs' claim. *See* N.C. Gen. Stat. § 75-1 *et seq*. Specifically, North Carolina does not apply federal principles to claims for anticompetitive conduct. *Supra* A.3. Count 38 remains.

**Vermont**

Plaintiffs' claim fails under Vermont law. The Vermont Consumer Fraud Act ("VCFA") encompasses both antitrust and consumer protection violations. *See* Vt. Stat. Ann. tit. 9, § 2451 *et seq*. However, Plaintiffs here fail to adequately raise allegations of deceptive conduct, *see supra* B.1, thus, Plaintiffs' claim under the VCFA can only be understood to assert a violation for anticompetitive conduct.

In holding indirect purchasers can bring antitrust suits pursuant to the VCFA, the state's supreme court explained that the VCFA harmonization provision does not "defin[e] who can sue under the VCFA, but rather what conduct constitutes a violation of the Act." *Elkins v. Microsoft Corp.*, 817 A.2d 9, 17 (Vt. 2002). An intermediate appellate court in Vermont later held the state's high court would apply the *AGC* factors to the extent that doing so would not bar otherwise permissible indirect purchaser suits. *Fucile v. Visa U.S.A., Inc.*, No. S1560–03 CNC, 2004 WL 3030037 (Vt. Super. Dec. 27, 2004) (holding the indirect plaintiff lacked standing to sue because the "causal chain" between the alleged conduct and the injury was "too long" and would require speculation that "extends far beyond a court's abilities"). To reconcile its decision with the *Elkins* court, the *Fucile* court explained that the *AGC* factors rest in Article III standing, therefore, the Vermont Supreme Court would apply the *AGC* factors to indirect purchaser claims, insomuch that doing so is consistent with allowing indirect purchaser standing. *Id*. at *3.

Because the state's high court explicitly held the harmonization provision applies to determining what constitutes an antitrust violation under the VCFA, and the state's high court has not rejected *Fucile*'s application of *AGC*, I find the court would require a plaintiff to adequately participate in the relevant market beyond paying alleged overcharges of professional services to raise a violation of the VCFA for anticompetitive conduct in accordance with federal principles. As explained above and in the Court's previous order, *see* ECF No. 103, Plaintiffs in this matter fail to do so. Therefore, Count 43 is dismissed.

### CONCLUSION

Defendants' Second Renewed Motion to Dismiss (ECF No. 106) is GRANTED in part and DENIED in part. Counts 12, 14, 20, and 38 remain.

**SO ORDERED.**

Dated this 28th day of March, 2025.

/s/ Stacey D. Neumann
Chief U.S. District Judge